and we'll take just a moment for everybody to get comfortable and clear out the courtroom before we start. All right, we'll hear first from Mr. Moore. May it please the Court, I'm Layton Moore. I represent the plaintiffs and appellants in this case. This case has been before the Court once before and in the first appeal, I just want to briefly address the effect of that first appeal. The law of the case doctrine provides that legal determinations made in that first appeal are binding on the district court and subsequent panels. Because of the different procedural posture, the first appeal was an appeal from the grant of a motion to dismiss for failure to state a claim. And this one is a summary judgment appeal. Fact issues must be decided under the summary judgment standard. But the issue of what the law was and whether it was clearly established at the time of the incident, those issues were decided. This is a case involving a seizure within the curtilage of a home and I want to first address that issue. The existence of curtilage is a fact issue and it has to be resolved in plaintiff's favor under the summary judgment standard. But in addition, plaintiff moved for summary judgment, partial summary judgment on that issue in the district court. That motion was denied as moved, but we would ask that the Court in its discretion address that issue in the appeal because it's certain to recur. It's a threshold issue to the arguments that are made regarding the warrantless seizure. Plaintiff is entitled to summary judgment on the issue of curtilage for several reasons. First, this Court's precedent, more specifically that of the former Fifth Circuit, and that of the Georgia Supreme Court both hold that the fenced backyard of a home is curtilage. And the cases are Fixel v. Wainwright, that's the Fifth Circuit case, 1974 case, and Landers v. State, a 1983 decision. Counsel. I was just going to say, you know, we often don't decide issues for the first time that the district court hasn't decided. Why should we do it here instead of if we were to agree with your position, and I'm not saying whether we will or we won't, but if we were to agree with your position, why shouldn't we just send it back and have the district court decide it in the first instance? Because this is the second appeal already, and if the court were not to dispose of all the pending issues in this appeal, there's a risk that we'd be coming up for a third appeal and that the trial might be delayed until 2025. But let me ask you a question. Let's assume that I agree with you that it's curtilage. Even in such a situation, if there are exigent circumstances, do a warrantless entry into curtilage? That's correct, Your Honor. Exigent circumstances would justify a warrantless entry, but a jury could find that they didn't exist here. Correct. But wouldn't that be then, wouldn't the threshold issue really be whether or not exigent circumstances existed? Well, it depends which way that issue goes, Your Honor. If exigent circumstances did not exist, then defendants win. If exigent circumstances did exist, then the curtilage issue must be decided, and our argument is exigent circumstances. Sorry, did I say that right? It's the opposite way, right? I said it right. It's okay. If exigent circumstances did not exist, then the curtilage issue must be reached because that's when they're necessary. Isn't this case, Betz, a case that's suited to go in front of a jury where a jury then can make a factual determination first as to whether exigent circumstances existed? Because you do have varying versions. I know that there is some agreement, but there is also disagreement. That's correct, and we believe there is a jury question as to whether exigent circumstances did exist, and I'll turn to that. So your position is basically that we're going to, in order to decide the exigent circumstances question, well, I guess you have to decide, both of them have to be decided in your favor, right, for you to win. If only one of them is decided in your favor, then your client can't win, right? That's right, Your Honor, but there are two ways for the curtilage issue to be decided in our favor in this appeal. One would be for Your Honors to find that it's a fact issue for the jury, and the second would be to reach the issue of whether we're entitled to summary judgment. Fair enough. Thank you. An officer must have probable cause to believe that the exigent circumstances exist, and the reasonableness of that belief is evaluated by the circumstances then confronting the officer. That's a quote from Smith v. LePage, a 2016 decision of this Court. The deputies have argued one exigent circumstance, which is an alleged imminent threat of serious harm. As the Court held in the first appeal, what defendants have to show is that they reasonably believed, i.e., under Smith v. LePage, had probable cause to believe, that an emergency existed which called for, quote, an immediate response to protect citizens from imminent danger. And that's a quote from the United States v. Holloway. As the Court held in O'Kelley 1, the imminent danger standard is not met unless there is an urgent need for immediate action, leaving the officers no time to secure a warrant. So to the extent that my friend argues that the amount of time it would have taken to secure a warrant is not a relevant fact issue, that issue was decided in O'Kelley 1. In addition, it's been decided by the Supreme Court. So let me ask you something. You would agree, would you not, that the officers couldn't have just walked away from this situation, right? So the question really is, should they have obtained a warrant or not? It's not that there was a third option here, they should have walked away, right? Well, they had seven officers at the scene. The question is whether one of those officers could have been dispensed with to go to the magistrate. Right. So you agree with what I'm asking you then, which is you agree that there wasn't a realistic option for the officers to just walk away, leave the scene and leave Mr. Turner, or Harley, I guess, to, you know, with his gun and his drunken state and his sort of belligerent attitude towards his stepfather. That wasn't really an option to just sort of leave the scene and leave that in play. So there were two options.  And the other one was to send somebody to get a warrant, and then if while that person was getting a warrant, there was a later problem that became, you know, that somebody's life was, it was a life or death situation, then maybe they could have breached. Is that what your position is? If an imminent threat developed during the time someone was going to get a warrant, then they can lawfully enter because there are exigent circumstances. Right. But the important thing to look at is what they actually did just before entering the curtilage. So what was the plan? The plan was, Sergeant Curran's plan was to send Deputy Curran, who was a trainee, with her gun holstered and her hands up to walk up to the gate and stand and talk to Harley. That's the plan. If Deputy Curran had judged in that situation that there was a serious risk that she was going to be shot, he wouldn't have done that. So let me ask you this. He would have taken the assignment. And I understand where you're coming from on that. But let me ask you this. I understood that the plan was to get the officer into position so he could use the bean bag, the bean bags to sort of get the gun away from, or to sort of throw Harley off base, and that would allow the other officers to get the gun away from him. That was Sergeant Curran's plan. Okay. Now, in order to do that, he had to be close enough that he could hit Harley with the bean bag, right? Presumably. Right. And so I'm understanding the position of the officers to be that in order to line themselves up to be in a position to avoid imminent harm, I guess, or whatever, that they had to cross onto the curtilage. Is that some kind of an exception or is that a problem because there aren't exigent circumstances at the time? Well, there have to be exigent circumstances. There has to be an ongoing emergency that requires immediate action at the time they cross the curtilage. So your position is they couldn't then line themselves up in preparation for taking care of this problem in what they hoped would be a less lethal way that seemed to keep, I mean, there was a 30-minute standoff, right? I mean, he had a gun. There was a 30-minute standoff. There were arguments going on. He was belligerent. And they couldn't take action to put themselves in a position to use the bean bags before it actually fully developed into, you know, life or death. And that might be the right position. I just want to make sure I'm understanding the position. The position is that they cannot cross over the curtilage unless exigent circumstances already exist before they do so. They can't anticipate that judgment, thinking, well, there might be exigent circumstances at some point in the future, so we better enter the curtilage now to get ready for that. Can I ask you a question about, so all this transpired within 30 minutes? Thirty-five minutes, Your Honor. And during some of that, because there's no video but there's audio, during some of that, Harley Turner goes back into his cabin, I guess, and does he take water or he, and he comes back out at some point? Yes, Your Honor. He tells the officers, I want a drink of water. And he goes and he gets a drink of water. And he comes back and he's got his flashlight in one hand and he's got a jug of water in the other hand. So his hands are full of harmless objects. That's the point when Deputy Kerger comes walking up and starts talking to him. And is that when he's saying that he wants to go to bed? He's been saying that for quite some time in the video, the audio, rather. The video doesn't capture the 30 minutes in the upper driveway. It captures about five minutes very vaguely in the lower driveway. I want to address very briefly just a couple of facts. Before you do that, and I think you're about out of time if you're not already, but a question back on the curtilage issue. I know you moved for partial summary judgment on it. Was there a cross motion on that issue? There was no cross motion. And was the response that there are facts in dispute on that issue or was the response the undisputed facts don't establish curtilage? That will ever, Your Honor. And defendants have hired an expert witness who is going to testify that this was not curtilage. That's another reason why I'm asking the court to decide that because there will be a round of Dalbert motions on that issue. I took up a fair amount of your time. I'm going to give you two more minutes. I'll give opposing counsel two more minutes as well. I know there were some things you wanted to address. Thank you, Your Honor. I appreciate that. Your Honor, I want to briefly address the issue of collective knowledge. Defendants rely on the collective knowledge doctrine to say that, to impute all sorts of knowledge to Sergeant Curran, including things that were said only to the 911 dispatcher and never to any deputy, and including some things which defendants allege the deputies down at the lower gate knew but Sergeant Curran never knew and never was told. We have actual evidence of the communications among these officers at the scene, and the summary judgment standard requires that evidence to be taken in plaintiff's favor. We know what they said to each other. They all wore audio packs. So there's no call to impute knowledge into a void to fill some gap in the record. The gap isn't there. Defendants are asking this court to apply a form of collective knowledge, this horizontal imputed collective knowledge. Do we need to be concerned about what Curran knew or did not know about the events at the lower gate? Because it seems to me that the exigency existed or not at the upper gate, and whatever happened at the lower gate is background, but it really doesn't tell us whether there was an exigency when they entered. And what we seem to know is when Curran showed up at the scene, he saw what was going on, and that either was an exigent circumstance or it wasn't. So why do we need to be concerned about collective knowledge beyond that? That's exactly right, Your Honor, and that's basically my argument, that to the extent that my friend asks you to impute to Sergeant Curran knowledge of things that he didn't actually know, the arguments in our reply brief address that issue. It contradicts the summary judgment standard. It also is a form of collective knowledge that some circuits don't acknowledge at all, but that the Supreme Court has never approved, and he's asking you to apply it to the determination of exigent circumstances, not, as this Court previously has done, to the determination of probable cause to believe a crime's been committed. Those are very different contexts. Thank you, counsel. Thank you. And you've reserved four minutes. We'll hear from, is it Mr. Freitas? Mr. Freitas. Mr. Freitas. I apologize. And I am Phil Freitas, and I have the pleasure of representing the appellees here, and it's an honor to be before this Court. Lots of different moving parts to this case. I will address curtilage if I'm asked to, more than happy to, and I am prepared to. Well, it's up to you what you want to address, except to the extent that we might have questions for you. Okay. But opposing counsel has addressed it, and so if you have something that you want us to consider. All right. So I guess analytically that's where we have to start, because if there is no crossover into the curtilage, this case is over because of the way that he's brought the case. The excessive force portion of the case has been waived. It is not a discrete K claim. The excessive force and what happened is going to be a measure of damages based upon the breach of curtilage. As far as the curtilage goes, yes, this is a fenced-in property. It is a fenced-in property with Stan and Jan O'Kelley's home. Besides that home, there is a pump house with a carport, and on the other side of the pump house with the carport is where Harley Turner lives in a chalet. Can I interrupt you for a second? Yes, sir. Because I think this goes to Judge Rosenbaum's question of who should make that assessment in the first instance, whether it's us or the district court, and that might a lot depend upon whether there's a factual dispute about all of the elements that go into the balancing test. And so I guess my question to you is, what is your position as to the facts that would be necessary to make a curtilage determination? Are there any in dispute, or are the facts undisputed and the parties simply disagree as to how those facts weigh and balance into the curtilage test? Yes, so I don't mind this court ruling on it as to which would be more important, which would be more appropriate. I don't think that the relevant facts are in dispute, and Mr. Moore can call me on that if I present something that is disputed. Besides those two homes and the pump house and the carport in between the two homes, there is what used to be a home. It's not on the O'Kelly's property, but it is inside the enclosure of the fence, and that's another 100 yards past Harley's home. It's a trailer. Somebody used to live there, a relative. It's that person's property. There's no division between the properties to the naked eye. And, yes, it had been abandoned, apparently undisputed since the early 2000s, unbeknownst to my law officers who can't see that. The curtilage, the point of entry in this case, is at the corner of a privet hedge and the O'Kelly's home. The privet hedge and the area between the privet hedge and the O'Kelly's home is between six feet at one point and two feet at another because of all the stuff that's in there. The privet hedge and the area between the privet hedge and the O'Kelly's home, we concede, would be curtilage to the O'Kelly's home. They have a subjective and objective expectation of privacy. That's why it's there. You can't stand outside the fence and look into the privet hedge and see into the windows. That's why it's there. Okay? And we have no problem with that. We have a problem with whether Harley Turner had a subjective or an objective reasonable expectation of privacy in the area between the privet hedge and the O'Kelly's home. In order for law enforcement to get onto the property without a warrant, they had to jump over an existing privet hedge or a fence, correct? Yes, ma'am. Yes, ma'am. Because it's all fenced in, the entire property. There are plenty of case laws saying that just because there is a fence doesn't mean that every home and structure on there has the same reasonable expectations of privacy they're on. And so this privet hedge was not used as a path. That is undisputed. It's not used as a path. They put junk back there, saw horses. And there is no testimony from, obviously, Harley Turner or anybody else that Harley Turner ever went there, ever used it, ever sat there and smoked cigarettes. He wouldn't have had the right to go between the privet hedge and the house and peer into the O'Kelly's home. Wasn't there evidence that he essentially used the Kelly's home for cooking and other intimate activities? So, I mean, this isn't your typical arrangement where you have two unrelated people living in one fenced property. This was an interrelated family and he came and went from the Kelly's house, O'Kelly's house, as if it was his own. So how does that weigh in? Fair enough. I wouldn't go so far as to say that he came and went as if it was his own home. He came and his meals were cooked for him. He took his meals and went back to his own home to eat them. That's the testimony in the case. And it's a good question. It's obviously a legal question. I don't think it's a factual question. But, again, he has to have a subjective expectation of privacy to go along with the objective in that particular curtilage. And we don't believe that he did. Let me shift you to the exigent circumstances question. And I guess the way I'm looking at the case is if there was no prior opinion in this case, the circumstances that the officers were confronted with when they got to the upper gate with a delusional person with a gun pacing around, saying all the things he was saying, in some objective sense seems fairly exigent to me. And I'm not an officer and I would probably defer to them. But we do have the prior opinion. And I guess what I'm struggling to see is how the facts, as they developed at summary judgment, are any different from the facts at the upper gate that the prior panel looked at, assumed to be true, and said was sufficient or insufficient to establish exigent circumstances. And that pinpoints the whole case. And so let me explain what I believe to be the exigent circumstances, how long the exigent circumstances go, and whether or not whatever exigent circumstances that occurred on the lower driveway were still around once the upper driveway came into play. So by the time our officers get there, and here's the thing, in order to cross that fence, we have to have probable cause and exigent circumstances. It appears from the briefing. I'm sorry? Without a warrant. Without a warrant. Yes, ma'am. Yes, ma'am. It appears to me from the briefing that the appellant has now conceded probable cause. Now, not necessarily probable cause that there was exigent circumstances, but probable cause to arrest in the first instance. Our deputies were aware that the call had come in that Harley, they didn't know who Harley was at the time, had threatened to shoot the hunters. So our three deputies go and they meet with the hunters, and the hunters say, he cussed us bad, he's drunk as a skunk, he said that he was going to cut us up into little parts and feed us to our dogs. Now, our officers go to the driveway that leads to the property. On the driveway, and you can hear this on the audio, and there is visual, a part of this, the first five to seven minutes you can see a whole lot, and there's a whole lot after that that is important, but you won't be able to see Harley. In that, when we get there, Stan O'Kelly, the owner of the property, comes out. He says, I'm the owner of the property. The person you're looking for is my stepson, Harley. He's armed and he's out of his ever-loving mind. And we're like, he's armed? What kind of guns does he have? He says, well, he's got a .45 and an SKS. SKS. Now, you will hear it on the audio. If it's real close, I have never put it in any of the briefs, but you will hear the female deputy, Kerger, as soon as he says SKS, say, shh, as in not be quiet, shh. So we've got a heightened alert. Our deputies then see Harley. He's about 75 feet away. He's on his side of the fence. We walk over. We want to talk to him. The talking never, ever, ever is productive because he's got a gun in one hand and a spotlight in the other. And, of course, our officers are put the gun down, put the gun down, put the gun down. This is a guy who's already threatened to shoot somebody, as far as they know. He's drunk, as far as they know. And along with the .45 in his hand, somewhere around here is an SKS. But certainly not in his hand. Not in his hand. Oh, no, no, no, no. It ends up being in his cabin there, which he actually went back into. But we never know where it is. We never see it, which doesn't help much. Can I ask you a question? Yes, ma'am. Because the hunters make the phone call. But Harley Turner says this while he's inside his property, correct? He doesn't make these threats outside the property. We have no evidence that he did, no. I mean, you would agree, hypothetically, you could have somebody in their property and he could be doing practice shots with a gun. He's legally entitled to do that. Absolutely. Correct. So the fact that he's armed is not necessarily the exigent circumstances. The fact that he's got it in his hand and he's already threatened to shoot someone and we've asked him to put it down. He threatened to shoot people who he thought were going to trespass onto the property, correct? Who knows? Who knows? Isn't that what he said during the audio? That is what he says during the audio. He's absolutely right. He says that that's what he's believing. Other testimony in the case lends to a different thought on that, but it's not known to our officers at the time. So our officers believe that he's threatened to shoot someone or forgot to say he was arguing loudly with his grandfather, who we assumed was O'Kelly, who's there, and we come up and he won't put the gun down. It is our belief that not only do we have probable cause, we now have exigent circumstances because he's threatened to shoot somebody. He's argued with his grandpa and he won't put his gun down and he's shining his doggone spotlight in our eyes. How do you address the argument that the circumstances at the time they breached were not exigent because they were willing to allow one of their officers to essentially approach him unarmed? Sure. She was armed, but indicating she was not going to. Sure. We were broadening our options. We wanted this to end nonlethally. Frankly, I think we had the right to shoot him the first time he wouldn't put the gun down because he's waving it around, he's shooting the spotlight. We are blinded while he's doing all of this. But even so, even assuming you had the right, assuming without deciding, you had the right to shoot him at the time he was shining the spotlight in the eyes of the officers and waving the gun around. That time has passed. It doesn't give the officers license to shoot him any time after that. I think that's what Judge Wetherill is getting at. Once that moment passed and the officer, Kerger, went to the fence and raised both hands to show that she was unarmed, why doesn't that suggest that it wasn't exigent circumstances? I think that perhaps arguably it could. But with this, let's all remember that this is qualified immunity and arguable probable cause. I believe arguable exigent circumstances is a proper standard. Apparently, our circuit has never reached that if I couldn't find it. And I haven't found circuits that have. I have found a couple of district court cases. Actually, I think we have found that in the Feliciano v. City of Miami case. The Eleventh Circuit didn't address it. The lower court had. And even though the decision went the other way, it did not say that that was an improper standard. So I don't think it was even a substantial acceptance. But if exigent circumstances no longer exist, then the officers would not have the right to enter curtilage without a warrant. Absolutely correct. I contend, though, that the exigent circumstances continued. He continued to say, shoot me, shoot me, shoot me, shoot me. What do you do with the period of time where he goes back into his house and he gets water and he comes out with water and a jug? Not sure what to make of that. I mean, at some point you can have exigent circumstances and then exigent circumstances dissipate. I agree. I believe, though, and that's a great point, and my contention throughout this case is we had exigent circumstances to begin with. We had exigent circumstances at the end. The severity of the imminence did decline, obviously. A jury question? I wouldn't think so. I wouldn't think so. I think that this is a question. You both have different, same facts but different applications of what those facts mean for purposes of exigent circumstances, so it seems to me that perhaps a fact finder would be best suited for this job. I believe that the standard is that it's a mixed question of law and fact and that I think that this court can rule on that, and I believe that it should. Let me ask you a question going back to the curtilage. Your opponent suggested that you've retained some sort of expert to opine about curtilage, and I guess I'm just curious about that given what you've told us today, that the facts that we would need to decide whether this was curtilage or not are really not in dispute, and ultimately it becomes a legal question. If that's the case, what would an expert have any bearing on? Absolutely nothing. He has nothing to say about curtilage that this court should take into consideration whatsoever. I agree. And so was he mistaken in believing, your opponent mistaken in believing that that expert, you were going to bring an expert to trial if this case went to trial to opine about curtilage? Our expert was retained specifically to talk about the officer's force actions and their tactics and the whatnot. He went into curtilage, and, in fact, if I'm not mistaken, his deposition was entered into evidence when you moved for partial summary judgment as opposed to us responding to it. It might have been the other. He has nothing to say about curtilage. Okay. That solves the Dahlberg concern that your opponent had in the event this goes back. Yes. We pull him back. Understood. My time's up. I'd love to keep going, and I'd love to talk about collective knowledge. We'd love to do it, too, but we have some other cases we have to hear. I appreciate the active bench and the fact that you know the case so well. Thank you. Thank you, counsel. All right. Mr. Moore, you've got four minutes. I'd like to briefly address the phrase that appears in defendant's brief, the emergency aid exception. In some of the cases, the law appears to use this as just an alternate for exigent circumstances. Some circuits consider it as a separate thing because there doesn't have to be sometimes there doesn't have to be probable cause to enter a property to believe that there's any crime being committed if, you know, the police think someone's having a heart attack or something like that. And that would be emergency aid as well. Here, it's just a misnomer. They weren't, the officers weren't coming to anyone's aid who was in some kind of immediate danger. They were trying to arrest Harley. That's why they wanted to cross into the curtilage. He was the only one there, and he wanted them to go away. So there's no one there who needs their help. In fairness, I think they were also trying to disarm Harley. You know, I don't think they could, as we've discussed previously, I don't think they felt they could just leave the scene with Harley in possession of two firearms in his state and his belligerent sort of approach to his stepfather and everything else that was, and the officers, his refusal to cooperate, et cetera. And so then the question becomes, what are the means by which they do that? And Deputy Musgrave, for his part, who was present on the scene a little bit longer than Sergeant Curran, when he was down in the trees with the other deputies as the transition was being made to the upper driveway, Deputy Musgrave took the buckshot out of his shotgun and replaced it with less lethal. And he told Deputy Holloway he was doing that because, in his judgment, it was not a lethal force situation. He thought that it was not going to be the type of situation where someone got shot. He switched over. Let me ask you, if I could, and didn't talk about it, nor did your opponent, but if I understood your briefing on the state law issue, your view was that the prior panel determined that unless this was a self-defense situation, the state law claim could go forward. There's no evidence in the summary judgment record this was self-defense. Thus, the state law claim should go forward. Is that your position, at least? Well, there is a level of intent as well under the state case law that the Kidd case cited in the prior opinion refers to. And what happened here was this ruse where Deputy Kerger walks out with her hands up and lures Harley to the gate so that he can be shot with a beanbag. And so if that's not legally justified either by self-defense or probable cause plus exigent circumstances, Well, I guess the reason I'm asking the question is because it looked to me like the prior panel opinion conflated or combined Georgia law into something that maybe I don't think they intended to do. In other words, they correctly stated you have to act with actual malice or with the intent to cause injury. And then they go on to say in police shooting cases, it often comes down to self-defense. And I don't think they intended to say it always comes down to self-defense. And so isn't the analysis we're looking at is really whether there was actual malice here? Or intent to cause injury. Either one of those two things. If that's the test, it doesn't seem like it's met here in the sense that they certainly had no actual malice. They were not trying to intentionally harm him. And the injury they were intending to cause by shooting him with the beanbag, I'm not sure that meets that test. I'm struggling to understand how you have a Georgia state law claim on one. Right. Well, if it's intentional conduct that is dead certain to cause injury, being shot from a ten-foot distance with three of these beanbag rounds, and it's not justified either by probable cause plus extra circumstances or self-defense, then, and this was a deliberate planned operation. So I think the level of intent is met. Thank you, Counsel. Thank you, Your Honor. Thank you both for your case for a well-argued case. Next up we have Silver Comet Terminal Partners v. Paulding County Airport Authority.